STATE of Minnesota, Respondent,

v.

Tony Allen ROMAN NOSE, Appellant.

No. CX–01–1560.

Supreme Court of Minnesota.

Aug. 22, 2002.

John M. Stuart, State Public Defender, Steven P. Russett, # 161263, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, Doug Johnson, Washington County Attorney, John W. Fristik, # 32335, Assistant County Attorney, Stillwater, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Tony Allen Roman Nose, appellant, appeals from his conviction of first-degree murder during the commission of criminal sexual conduct in violation of Minn.Stat. § 609.185(2) (2000) for the July 11, 2000, killing of Jolene Stuedemann. Appellant claims that the trial court erred by failing to conduct a pretrial *Frye–Mack* hearing on the general acceptance within the relevant scientific community of the PCR–STR method of testing deoxyribonucleic acid (DNA) used by the Minnesota Bureau of Criminal Apprehension (BCA) in this case. Appellant also claims that the trial court erred by admitting the DNA evidence in this case, arguing that the state failed to show reliability under the second prong of the *Frye–Mack* standard, and by admitting certain other evidence. Appellant also claims prosecutorial misconduct. We conclude that the trial court erred when it failed to conduct a *Frye–Mack* hearing on the general acceptance within the relevant scientific community of the method of testing DNA used here and remand for hearing to determine if the PCR–STR method of testing DNA has obtained general acceptance within the relevant scientific community. We retain jurisdiction in order to resolve the other issues raised by appellant after that hearing, if necessary.

On July 11, 2000, the body of 17–year–old Jolene Stuedemann, an apparent homicide victim, was found by her sister in their home in Woodbury, Minnesota. A medical examiner determined, based on an examination of the body at the scene and an autopsy, that Stuedemann had been beaten and stabbed multiple times with a screwdriver, had been sexually assaulted, and that she bled to death as a result of multiple stab wounds inflicted during the sexual assault. An investigation led authorities to appellant.

Appellant, who was 17 years old when Stuedemann was killed, was a resident of a group home in Woodbury during the school year. Appellant normally returned to Montana during the summer months. Appellant testified that on the night before Stuedemann's body was discovered he decided to break group home rules so that he would be returned to Montana. On the evening prior to Stuedemann's homicide, appellant went to the home of his friend, Andy Reiman, who was dating Stuedemann and who lived about a mile from the group home. Reiman and Stuedemann re-

turned to Reiman's home, where they encountered appellant in the driveway, listening to his walkman. All three went into Reiman's home where they drank beer and watched television. Appellant claimed that Stuedemann also gave him some marijuana and that Stuedemann and he did some "coke."

Appellant testified that he was sitting on the couch listening to music with his eyes shut, and that when he opened his eyes, Reiman and Stuedemann were engaged in sexual intercourse. According to appellant, he and Stuedemann than had sex while Reiman slept. Reiman testified, however, that he did not fall asleep immediately after he and Stuedemann had sex and that he was certain that Stuedemann did not have sex with appellant.

Appellant fell asleep. Stuedemann left at 3:30 a.m. while appellant was sleeping. Reiman woke appellant and told him to leave as well. Appellant left at approximately 4 a.m. and eventually returned to the group home.

Because appellant had been reported as a runaway the night before, the house parent notified police of appellant's return to the group home, and a Woodbury police officer interviewed appellant. Appellant told the officer that he had been with Reiman the night before. The officer then left the group home and responded to a call that resulted in discovery of Stuedemann's body. Investigators discovered part of a set of headphones under Stuedemann's body. A piece of crumpled paper was found in Stuedemann's mouth with a fingerprint on it, later identified as appellant's, and a blood-stained screwdriver was found near her body.

Eventually, the house parent learned of blood-stained clothing that had been placed in a trash bag in the garage of the group home and that belonged to appellant, and she notified authorities. The lower half of a set of headphones was found in the group home's kitchen garbage. A forensic scientist determined that the headphones found in the garbage and the part of a set of headphones found under Stuedemann's body could have been a match. Authorities also found bloodstained underwear and a walkman with no headphones attached in appellant's bedroom.

Appellant testified at trial and offered a version of events different from the state's theory of the case. According to appellant, after he left Reiman's home he began walking toward the group home and realized that he no longer had his walkman. He attempted to sneak into the group home, but failing that, he went to Stuedemann's home, about a half-mile from the group home. There, he found the lights on but nobody answered the door. He was concerned Stuedemann had overdosed so he entered the home through the back door and there he discovered her body. Appellant testified that he ran inside, knelt on one knee beside the body, saw some paper in her mouth and tried to pull it out, but could not, and that he then saw his walkman next to Stuedemann's body. Appellant testified that he did not call police because he was scared, since he had used drugs and had sex with Stuedemann, had her blood on his clothing, and his walkman was next to Stuedemann's body. Appellant testified that he vomited in the toilet, took his walkman, and ran back to the group home. Appellant changed his clothes and slept in a van in front of the group home until later in the morning. He told a house parent that he changed his clothes because he had spilled beer on them.

The state offered DNA evidence at trial that was obtained from DNA testing of samples taken from the crime scene and the group home. The DNA testing was

conducted by the BCA using the PCR–STR method.[1] The DNA evidence showed that the DNA profile of blood samples taken from the screwdriver and appellant's personal property found at the group home matched Stuedemann's DNA profile and that semen samples taken from Stuedemann's body matched appellant's DNA profile. Before trial, appellant requested a *Frye–Mack* hearing to determine first, whether the PCR–STR method of testing DNA is generally accepted within the relevant scientific community and second, whether the state could establish the necessary foundation for admission of the test results in this case. The trial court granted a hearing only on the second issue. Following the limited *Frye–Mack* hearing, the court ruled the DNA test results admissible.

Appellant was found guilty by a Washington County jury of murder in the first degree while committing or attempting to commit criminal sexual conduct and premeditated murder in the first degree. The court entered conviction only on the charge of murder in the first degree while committing or attempting to commit criminal sexual conduct in the first or second degree under Minn.Stat. § 609.185(2), and sentenced appellant to life in prison without parole. Appellant appeals the decision of the trial court denying a *Frye–Mack* hearing on the general acceptance of the PCR–STR method of testing DNA, the trial court's ruling on prong two of the *Frye–Mack* standard, and the trial court's evidentiary rulings. Appellant also argues that the state committed prosecutorial misconduct. Appellant argues that he was denied his right to a fair trial and seeks a new trial.

We must determine whether the trial court erred when it denied appellant's request for a pretrial *Frye–Mack* hearing to determine whether the PCR–STR method of testing DNA has gained general acceptance within the relevant scientific community. We begin our analysis with a brief overview of the *Frye–Mack* standard for determining admissibility of scientific evidence and its development in Minnesota.

■ In our decision in *State v. Kolander*, 236 Minn. 209, 221–22, 52 N.W.2d 458, 465 (1952), we adopted the standard for the admissibility of evidence obtained from new scientific techniques that was set forth in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), which requires "general acceptance in the particular field in which [the scientific principle or discovery] belongs." *Frye*, 293 F. at 1014. Subsequently, we stated in our decision in *State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980), that "the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate." We stated that the particular evidence must have a foundation that is scientifically reliable. As a result of *Frye* and *Mack*, a two-pronged standard has emerged in Minnesota that must be satisfied before scientific evidence may be admitted. First, a novel scientific technique that produces evidence to be admitted at trial must be shown to be generally accepted within the relevant scientific community, and second, the particular evidence derived from the technique and used in an individual case must have a foundation that is scientifically reliable. *Goeb v. Tharaldson*, 615 N.W.2d 800, 810 (Minn.

---

1. PCR stands for "polymerase chain reaction" technique. There are various methods of the PCR technique. STR is the newest PCR method and stands for "short tandem repeat" technology. The PCR–STR method of testing DNA has been used by the BCA since February 1999.

2000) (reaffirming adherence to *Frye–Mack* standard after *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).[2] Put another way, the *Frye–Mack* standard asks first whether experts in the field widely share the view that the results of scientific testing are scientifically reliable, and second whether the laboratory conducting the tests in the individual case complied with appropriate standards and controls. *State v. Jobe*, 486 N.W.2d 407, 419 (Minn.1992).

■■■■ The trial court determines whether the *Frye–Mack* standard has been satisfied by means of a pretrial hearing.[3] When the scientific technique that produces the scientific evidence is no longer novel or emerging, then the pretrial hearing should focus on the second prong of the *Frye–Mack* standard. *See Jobe*, 486 N.W.2d at 420.

In this case the trial court denied appellant's request for a hearing on general acceptance of the PCR–STR method within the relevant scientific community. We must determine, then, whether evidence obtained from the PCR–STR method of testing DNA is novel, such that a pretrial

hearing should have been conducted to determine whether the PCR–STR method has gained general acceptance within the relevant scientific community.

We have considered the general acceptance within the scientific community of DNA testing and the admissibility of DNA evidence in earlier decisions. *See, e.g., State v. Johnson*, 498 N.W.2d 10, 14 (Minn. 1993); *Jobe*, 486 N.W.2d at 419–20; *State v. Schwartz*, 447 N.W.2d 422, 427–28 (Minn.1989); *see also State v. Bloom*, 516 N.W.2d 159, 160–69 (Minn.1994); *State v. Nielsen*, 467 N.W.2d 615, 619–20 (Minn. 1991). DNA typing is generally acceptable, *Schwartz*, 447 N.W.2d at 426, and we do not question the theory of human genetics underlying DNA testing and the basic validity of DNA analysis. *Bloom*, 516 N.W.2d at 164.

Our previous analysis was of the RFLP method of testing DNA, however. Relying on *Schwartz*, we stated in *Jobe* that the required *Frye–Mack* hearing "should focus only on whether the laboratory which did the testing was in compliance with the appropriate standards and controls. It should not be a forum for challenging the basic DNA RFLP testing procedures

**2.** In *Daubert*, the U.S. Supreme Court recognized that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence and that the Federal Rules of Evidence do not contain a "general acceptance" requirement for the admissibility of scientific evidence. 509 U.S. at 587–88, 113 S.Ct. 2786.

**3.** When a new scientific technique emerges, such as the PCR–STR method of testing DNA, the evidence obtained from that technique is not admissible unless the technique for obtaining the evidence has been generally accepted within the relevant scientific community. *Goeb*, 615 N.W.2d at 810. The dissent analyzes the limited record that accompanies appellant's motion for a *Frye–Mack* hearing on general acceptance and the state's answer to the motion and concludes that the state has met its burden of demonstrating that the

PCR–STR method is generally accepted. However, the issue of whether a technique is generally accepted within the relevant scientific community is best determined by evidentiary hearing. *See Goeb*, 615 N.W.2d at 814. There was no evidentiary hearing on general acceptance in this case and, contrary to the dissent's argument, hearings before other district courts will not substitute for the evidentiary hearing required here. Without an evidentiary hearing on the views of the relevant scientific community, trial and appellate judges become scientists, an approach we clearly rejected in *Goeb*. 615 N.W.2d at 813–14. Our review of the issue of general acceptance of the PCR–STR method of testing DNA will focus on the trial court's findings and conclusions and the record of the evidentiary hearing we here order.

themselves." *Jobe*, 486 N.W.2d at 420 (footnote omitted). We concluded in *Jobe* that the RFLP method should no longer be challenged in a pretrial *Frye–Mack* hearing because the general acceptance of the RFLP method had been established at the trial court level by means of a *Frye–Mack* hearing and affirmed by this court in *Schwartz*, 447 N.W.2d at 425. *See Jobe*, 486 N.W.2d at 420.

The state points to the decisions of other appellate courts that have upheld admission of DNA evidence obtained from PCR–STR testing to argue that a *Frye–Mack* hearing on general acceptance of the PCR–STR method is unnecessary. *See People v. Allen*, 72 Cal.App.4th 1093, 85 Cal.Rptr.2d 655, 659–60 (1999); *People v. Shreck*, 22 P.3d 68, 83 (Colo.2001); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739, 743 (1997); *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317, 325 (1998); *State v. Butterfield*, 27 P.3d 1133, 1143 (Utah 2001).[4] However, other jurisdictions have different standards for the admissibility of evidence obtained from scientific techniques, some adhering to the federal *Daubert* standard and others to state rules of evidence. *See, e.g., Shreck*, 22 P.3d at 72 (state rule of evidence); *Rosier*, 685

N.E.2d at 741 (*Daubert* standard); *Butterfield*, 27 P.3d at 1142 (state rule of evidence). In addition, even those appellate decisions that affirmed the admissibility of DNA evidence obtained from PCR methods of testing DNA generally did so only after reviewing the findings and conclusions of the trial court following an evidentiary hearing.[5] *See, e.g., Beasley*, 102 F.3d at 1445, 1447–48; *Brodine*, 936 P.2d at 548, 550–51; *Tankersley*, 956 P.2d at 491–92; *Shreck*, 22 P.3d at 72, 80; *Rosier*, 685 N.E.2d at 741–43; *Carter*, 586 N.W.2d at 826, 828; *Jackson*, 582 N.W.2d at 324–25; *Butterfield*, 27 P.3d at 1137–38, 1145. The decisions of other appellate courts may be relevant evidence at an evidentiary hearing on the general acceptance of a scientific technique within the relevant scientific community. To rely exclusively on decisions of other appellate courts rather than on the testimony of expert witnesses to establish general acceptance, however, would be a departure from our precedent requiring a *Frye–Mack* hearing to determine general acceptance within the relevant scientific community.

■ General acceptance within the relevant scientific community of the PCR–STR method of testing DNA is not a matter this

---

**4.** The state also cites decisions that upheld admissibility of evidence obtained from other PCR methods. *See United States v. Beasley*, 102 F.3d 1440, 1447 (8th Cir.1996); *Brodine v. State*, 936 P.2d 545, 550–51 (Alaska Ct.App. 1997); *State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486, 492 (1998); *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818, 826 (1998); *State v. Harvey*, 151 N.J. 117, 699 A.2d 596, 624 (1997).

**5.** The dissent points out that every appellate court that has reviewed DNA evidence obtained from the PCR–STR method has approved its admission and further argues that our holding "sets Minnesota apart from the worldwide scientific community that has accepted this test." However, we do not decide today that the PCR–STR method is not a generally accepted scientific technique.

Rather, we conclude that its general acceptance has not been established by evidentiary hearing. Indeed, our disposition is consistent with other appellate courts in that virtually all of the appellate decisions cited affirmed admission of DNA evidence obtained from the PCR–STR method only after an evidentiary hearing. No evidentiary hearing was held here. It is not enough for us to believe the test has gained general acceptance in the relevant scientific community. The state must establish that it has gained general acceptance, and it must do so by evidentiary hearing. Thus, we are adhering to our precedent, which requires a hearing on general acceptance before novel scientific evidence is admissible, and our holding is consistent with the practice of other appellate courts.

court has previously addressed. The PCR–STR method is a new method of testing DNA that has emerged as an evidence-producing scientific technique.[6] The state asserts that because the PCR–STR method has been used by the BCA since February 1999, it is no longer a novel scientific technique and a *Frye–Mack* hearing is therefore unnecessary to determine its general acceptance within the relevant scientific community. However, we have not decided general acceptance for Minnesota courts. The BCA's practice is not dispositive of the issue, but may instead be relevant evidence at the *Frye–Mack* hearing to determine whether the technique has in fact gained general acceptance within the relevant scientific community. Once this court has reviewed and confirmed the general acceptance of a scientific technique, then the evidence produced by the technique may be admitted without the need for a pretrial hearing on the first prong of the *Frye–Mack* standard, as with RFLP DNA. *See, e.g., Jobe,* 486 N.W.2d at 420.

■ Because the PCR–STR method is a new scientific technique that this court has never before considered, and because it is sufficiently different from the RFLP method, the evidence obtained from the technique is novel scientific evidence.[7] It

---

6. DNA, a long, double-stranded molecule, is found in chromosomes in cell nuclei. It is found in all cells that have a nucleus. Most sections of DNA vary little among individual human beings. Polymorphic sections, however, do vary. If two fragments do not match, then they could not share a common source, but if they do match, then they may have a common source. The underlying theory of forensic use of DNA profiles is that as the number and variability of the polymorphisms used in the typing procedure increases, the odds of two people having the same profile decreases. *Bloom,* 516 N.W.2d at 161 (and citations therein).

Testimony at the *Frye–Mack* hearing in this case provides some explanation of the significant differences between the RFLP and PCR–STR methods of testing DNA. "Restriction fragment length polymorphism" was the first DNA technique used in forensic laboratories and is a lengthy process typically requiring four to six months. Using RFLP, scientists take a known sample of DNA and an unknown sample from the crime scene or from other evidence. The scientists extract DNA from the samples, cut it up into fragments, separate the fragments, locate the loci of the DNA that vary greatly among people, and then look at the DNA at those loci. The result is a type of bar code that can be used to compare the two samples to see how closely they match. The RFLP technique requires a high molecular weight DNA and a large amount of DNA—typically 500 nanograms to one microgram. Scientists are unable to get results using degraded DNA samples. The technique involves the use of radiation and consumes the DNA during testing.

The "polymerase chain reaction" technique, on the other hand, is a process by which DNA fragments too small to be suitable for the RFLP method can be analyzed because the technique requires much smaller quantities of DNA—the BCA uses between .5 and one nanogram of DNA. Furthermore, PCR involves no use of radiation and can be used on degraded samples of DNA. The technique involves extracting a small amount of DNA and then amplifying the DNA many times over using the polymerase chain reaction technique to increase the size of the sample before it can be subjected to analysis. Amplification involves three separate steps, none of which is used in the RFLP method.

7. The dissent disputes our conclusion that the PCR–STR method is significantly different from the RFLP method and asserts that "there is nothing in the record that indicates a "qualitative difference between one copy and many copies [of DNA] * * *." The dissent is focusing on the *results* of the PCR technique rather than on the *process* of the PCR technique itself. We have already stated that we do not question the science of DNA analysis; however, the scientific method used to obtain a DNA sample that can be subjected to DNA analysis is the science that is at issue here. And the polymerase chain reaction technique, used here to obtain a DNA sample that can be analyzed, is a scientific method that the state's own DNA expert witness testified is different from the RFLP method. *See* note 6

therefore requires not only a *Frye–Mack* hearing on the procedures and controls involved in the individual case but also a hearing on the general acceptance of the technique within the relevant scientific community before evidence obtained from the method is admissible.[8] *Goeb*, 615 N.W.2d at 814. That the RFLP method of testing DNA has gained general acceptance does not permit evidence obtained from significantly different methods of DNA testing to be admitted without holding a hearing on the first prong of the *Frye–Mack* standard. *See Goeb*, 615 N.W.2d at 814. Rather, when novel scientific evidence is offered that has not been reviewed by this court, the district court must determine whether the method of

producing the scientific evidence is generally accepted in the relevant scientific community. *Id.*

Even if it appears likely that in the course of a *Frye–Mack* hearing on the PCR–STR method of testing DNA the trial court will determine that the method has gained general acceptance within the relevant scientific community, the *likelihood* of such a determination should not be the basis for denying a *Frye–Mack* hearing.[9] When a district court conducts a *Frye–Mack* hearing only for a method of testing DNA that appears to the district court to be controversial or unsettled in the relevant scientific community, there is a risk that the judge is put in the role of

---

*supra.* Because the PCR technique is a new scientific method used to obtain a DNA sample that can be analyzed, the state bears the burden of establishing its general acceptance and its foundational reliability by means of an evidentiary hearing before evidence obtained from the technique may be admitted. That has not occurred in this case.

8. The dissent's approach to look to other appellate decisions to conclude that the PCR–STR method has gained general acceptance would eliminate the requirement of a pretrial evidentiary hearing on general acceptance, an important step in our time-tested procedure for admitting scientific evidence, apparently because the hearing may be "time-consuming and costly." This approach ignores the important purpose that the *Frye–Mack* hearing on general acceptance serves, which is to ensure "that the persons most qualified to assess scientific validity of a technique have the determinative voice." *Goeb*, 615 N.W.2d at 813.

9. The dissent argues that we should take "judicial notice" of the inherent reliability of the PCR–STR method of testing DNA unless something in the record indicates a reason to depart from the findings of other jurisdictions. But that is not the procedure we have established for determining the admissibility of scientific evidence. Moreover, there is an inadequate record to support taking judicial notice of the general acceptance of the PCR–

STR method because appellant's request for a hearing on the issue was denied by the trial court.

The dissent argues that there is overwhelming evidence that the PCR–STR method is generally accepted. Even so, the established procedure for determining general acceptance must be followed. Much, if not all, of the evidence relied on by the dissent may be admissible evidence at the required evidentiary hearing. The dissent further argues that appellant did not provide any evidence to refute the state's evidence. The proponent of evidence obtained from a scientific test bears the burden of showing its reliability. *See Goeb*, 615 N.W.2d at 814; *State v. Moore*, 458 N.W.2d 90, 97–98 (Minn.1990). As we have already made clear, this is done by means of an evidentiary hearing. Appellant did argue in his motion requesting a *Frye–Mack* hearing that "PCR testing is distinguishable from RFLP testing in that PCR testing involves amplifying (or 'copying') a DNA sample in a laboratory to increase the size of the sample." Further opportunity to develop the record and to refute the general acceptance of the PCR–STR method was denied appellant because his motion for a hearing on general acceptance was denied. Nevertheless, ample evidence *was* offered during the second prong of the *Frye–Mack* hearing by the state's expert DNA witness that the two techniques are significantly different, which the dissent appears to disregard.

scientist, a role that we rejected in *Goeb*. *Goeb*, 615 N.W.2d at 812–14. Rather, *Goeb* makes it clear that the district court is required to conduct a *Frye–Mack* hearing on the general acceptance of scientific techniques that are novel before evidence may be introduced at trial. 615 N.W.2d at 814. We therefore conclude that the trial court improperly denied appellant his right to a pretrial *Frye–Mack* hearing on the general acceptance within the relevant scientific community of the PCR–STR method of testing DNA.

 Appellant is entitled to a new trial only if the evidence was erroneously admitted and he suffered prejudice, however. *See State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996). The dissent asserts that even if the trial court improperly denied appellant a *Frye–Mack* hearing on general acceptance and therefore admitted the DNA evidence in error, the error was harmless beyond a reasonable doubt. We disagree. The relevant standard for determining harmless error is whether the jury's verdict is " 'surely unattributable' " to the error. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997) (citing *Jones*, 556 N.W.2d at 910). The DNA evidence in this case was specifically used to discredit appellant's theory of the case, namely, that an unidentified third party sexually assaulted and murdered Stuedemann. The state argued that there was no evidence of any other contributor to the DNA samples and that therefore the person whose DNA profile matched the DNA profile of the semen samples had to be the killer. We simply cannot say that the jury's verdict was surely unattributable to the admission of this DNA evidence given the importance that was placed on the evidence.

To determine whether the evidence was admissible, we remand the case to the trial court for a hearing on whether the PCR–STR method of testing DNA has gained general acceptance within the relevant scientific community. The hearing shall be concluded within 90 days of the filing of this opinion and, within 60 days thereafter, the trial court shall file its findings and conclusions with this court. In the meantime, this appeal is stayed. Appellant shall move the court to lift the stay in accordance with Minn. R. of Civ.App. P. 127 within 30 days after the trial court has filed its findings and conclusions in the district court.

Appeal stayed, jurisdiction retained, and remanded for hearing.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILBERT, Justice (dissenting).

The majority holds that the district court improperly denied appellant his right to a pretrial *Frye–Mack* hearing on the general acceptance within the relevant scientific community of the PCR–STR method of testing DNA. Based on this holding, the majority stays appellant's appeal and remands for a *Frye–Mack* hearing. I respectfully dissent.

The district court did not err when it admitted the DNA evidence derived from the PCR–STR test because the state established sufficient foundation that the PCR–STR test was not new, novel, or emerging within the relevant scientific community and appellant offered no proof that the test was new, novel, or emerging. Furthermore, even if a *Frye–Mack* hearing should have been held prior to admitting the DNA evidence, it is not necessary to remand for such a hearing under the facts of this case because any error in the

admission of the DNA evidence is harmless beyond a reasonable doubt.

The issue before us is whether the district court erred when it denied appellant's request for a pretrial *Frye–Mack* hearing to determine whether the PCR–STR method of DNA testing is generally accepted within the relevant scientific community. To address this question, it is necessary to detail the arguments and evidence presented to the district court by the state and appellant.

In its memorandum to the district court opposing a *Frye–Mack* hearing, the state contended that a *Frye–Mack* hearing covering general acceptance in the scientific community was unnecessary because the PCR–STR test is only a new laboratory technique rather than new, novel, or emerging scientific evidence. More specifically, the state contended that there is no requirement that such a hearing be conducted "whenever a technological advancement paves the way for an improved DNA testing method." In support of its argument, the state provided the decisions and findings of three Minnesota district courts in which those courts found that the PCR–STR test was generally accepted in the scientific community. *See State v. Licari*, No. K9–99–490 (Isanti County Dist. Ct. Sept. 20, 2000); *State v. Contreras*, No. K1–99–3420 (Ramsey County Dist. Ct. Apr. 24, 2000); *State v. Dishmon*, No. 99047345 (Hennepin County Dist. Ct. Mar. 3, 2000). In *Dishmon*, the court made detailed written findings regarding the general acceptability in the scientific community of the PCR–STR test. The court based its findings on the testimony of several expert witnesses [1] and the "huge body of scientific literature pertaining to STRs."

In his memorandum in support of his motion for a *Frye–Mack* hearing, appellant argued that such a hearing was necessary because the PCR–STR method was new and/or novel. Appellant contended that "[o]ther courts around the country, applying state versions of the *Frye* or *Daubert* analysis have found STR testing of the type used in this case is not generally accepted in the scientific community." Citing *Goeb*, appellant asserted that the state is required to conduct a hearing whenever a technological advancement paves the way for an improved DNA testing method. Appellant further contended that the PCR–STR test is new to the Minnesota courts and that the state, as the proponent of the evidence, has the burden to establish the proper foundation for the admissibility of the test by showing that it is reliable.

As evidence that the PCR–STR method was not generally accepted in the scientific community, appellant provided the decisions of four courts. According to appellant, the court in *Colorado v. Shreck*, No. 98CR2475, Div. 4 (Colo Dist. Ct.2000), found that the state " 'failed to prove by a preponderance of the evidence that STR multiplex techniques used in this case are generally accepted and the results reliable.' " However, the court in *Shreck* found that "PCR amplification, PCR–STR monoplex and triplex testing, and the relevant statistical analysis used in this case * * * are reliable and generally accepted in the scientific communities." According to appellant, the court in *State v. Pfenning*, No. 57–4–96 (Vt.Dist.Ct. Apr. 6,

---

1. The court heard testimony from Ann Gross of the BCA; Patricia Wojtowicz of the BCA; Dan Bergman of the BCA; Dr. Bruce Budowle, Chief of the Forensic Science Research Unit at the FBI; Dr. Arthur Eisenberg, Associate Professor in the Department of Pathology and Director of the DNA/Identity Lab at the University of North Texas and Chairman of the United States DNA Advisory Board; and Dr. P. Michael Conneally, Distinguished Professor of Medical Genetics at Indiana University.

2000), found that " 'the Court cannot establish whether Profiler Plus is a reliable system or one which is prone to error.' " However, the defendant in *Pfenning* did not challenge whether PCR–STR was generally accepted in the scientific community. Rather, the defendant claimed that the specific tests used in connection with his case were not reliable and that the laboratories did not follow established protocols.

Appellant also cited *State v. Bokin*, No. 168461 (Cal.Super.Ct. May 6, 1999), in support of his argument that the PCR–STR test was not generally accepted within the relevant scientific community. According to appellant, the *Bokin* court found that the STR test at issue "had not been scientifically validated and suppressed the results." Appellant also cited to *People v. Hunt, et. al.*, No. SA034500 (Cal.Sup.Ct. Oct. 24, 2000), for the proposition that a *Frye* hearing was necessary in an STR case. However, the *Bokin* court found that the prosecution had not established that the STRs as identified with a particular kit are admissible. Moreover, several California appellate courts have held that the PCR–STR is generally acceptable in the scientific community. *See, e.g., People v. Hill*, 89 Cal.App.4th 48, 107 Cal.Rptr.2d 110, 118–19 (2001); *People v. Allen*, 72 Cal.App.4th 1093, 85 Cal.Rptr.2d 655, 659 (1999).

The district court denied appellant's motion for a *Frye–Mack* hearing on the general acceptance of the PCR–STR test. In doing so, it explained that four separate Minnesota district courts had addressed the general acceptance of the PCR–STR test and had found that this method of testing is generally accepted in the relevant scientific community. In addition to the cases cited by the state, the court cited *State v. Payne*, Washington County District Court File No. K7–01–37.

Based on the evidence presented to the court, I would hold that the district court did not abuse its discretion in denying appellant's request for a *Frye–Mack* hearing on the general acceptance of the PCR–STR test. The state met its burden of demonstrating that the test is generally accepted within the relevant scientific community. Appellant offered no evidence calling into question the general acceptance of the PCR–STR test. In fact, the decisions cited by appellant either strongly supported the state's position that the PCR–STR test is generally accepted in the scientific community or were irrelevant. The district court, in making its finding, cited to four Minnesota district court decisions that had found that the PCR–STR test is generally accepted in the scientific community. The majority acknowledges that a court may take notice of decisions from other district courts within Minnesota and decisions from other jurisdictions regarding the general acceptability of certain scientific technologies. Under these facts, the district court did not abuse its discretion in denying a *Frye–Mack* hearing on the general acceptance of the PCR–STR test. The rule established by the majority automatically compels a *Frye–Mack* hearing on the basis of mere allegations and pure speculation that such a hearing is warranted.

Despite the absence of any evidence before the district court that the PCR–STR test was new, novel, or emerging, the majority insists that a *Frye–Mack* hearing is necessary because the PCR–STR test is a new method of testing DNA. In a footnote, the majority explains the difference between the RFLP testing procedures and the testing procedures of the PCR–STR test. According to the majority, the main difference between the two tests is that the RFLP test requires relatively large samples of DNA while the PCR–STR test can be done using a smaller

quantity of DNA that is amplified many times over to increase the size of the sample that is subjected to analysis. However, there is nothing in the record indicating the qualitative difference between a small amount and amplifying or copying a DNA sample. The majority simply asserts that the PCR–STR method of testing DNA is "sufficiently different" from the RFLP method. The majority concludes that "[b]ecause the PCR–STR method is a new scientific technique that this court has never before considered, and because it is sufficiently different from the RFLP method, the evidence obtained from the technique is novel scientific evidence" that requires a *Frye–Mack* hearing to determine its general acceptance within the relevant scientific community.

The problem with the majority's approach is that there is no explanation of what triggers a *Frye–Mack* hearing. Although the majority seems to believe that such a hearing is triggered when there is an allegation that a scientific technology is new or novel, the majority does not explain how much deviation from existing methods or practices must be present for a scientific technology to be considered new or novel. The majority defends its analysis by insisting that "the issue of whether a technique is generally accepted within the relevant scientific community is best determined by evidentiary hearing." This begs the question. The majority's lack of clarity regarding when and under what conditions a *Frye–Mack* hearing is appropriate creates the risk that our courts would have to put their imprimatur on every scientific technology based on an objection from a party without any offer of proof that a technology is new or novel. It also creates the risk that our courts must conduct time-consuming and costly hearings to establish the general acceptability of technologies whose general acceptability has been well documented by the appropriate scientific literature and judicial decisions from other jurisdictions.

There are two ways we can avert these problems. First, the majority should explain when and under what conditions a *Frye–Mack* hearing on the issue of general acceptance is required and should require more than pure speculation that a scientific technology is different from preexisting technologies before conducting such a hearing. Second, as the majority acknowledges, our courts can take notice of decisions from other jurisdictions regarding the general acceptability of certain scientific technologies to establish the general acceptability of the technology in this jurisdiction. *See State v. Butterfield*, 27 P.3d 1133, 1141 (Utah 2001); *Allen*, 85 Cal. Rptr.2d at 659; *Lemour v. State*, 802 So.2d 402, 404 (Fla.Dist.Ct.App.2001); *United States v. Trala*, 162 F.Supp.2d 336, 346 (D.Del.2001).

Here, although appellant has offered no evidence that the PCR–STR method is new or novel to require a *Frye–Mack* hearing, the majority permits a *Frye–Mack* hearing based on appellant's mere allegation that any change in technique for DNA testing requires such a hearing. It is not surprising that appellant could not provide any evidence that the PCR–STR test is new, novel, or emerging because there is overwhelming evidence that the PCR–STR test is generally accepted and is far from being new, novel or emerging in the scientific community. The test is used in multiple jurisdictions within the United States and around the world. As the testimony indicated, the BCA has used the test in Minnesota since February 1999 in hundreds of cases. The National Research Council II report indicates that the test is reliable. Indeed, every appellate court from around the country that has reviewed this test, including the appellate courts of

California, Colorado, Massachusetts, Nevada and Utah, has found the test to be accepted within the relevant scientific community and has permitted it to be used. Appellant has not cited any appellate court that has found the test to be unaccepted within the relevant scientific community, unreliable or otherwise invalid. The majority's holding sets Minnesota apart from the worldwide scientific community that has accepted this test. In light of the decisions from numerous jurisdictions regarding the reliability of the PCR–STR method of DNA testing, we should take judicial notice of the inherent reliability of the PCR–STR method in the interests of judicial economy unless something in the record indicates a reason to depart from the findings of other jurisdictions.

Further, even if a *Frye–Mack* hearing on the issue of general acceptance within the scientific community should have been held prior to admitting the DNA evidence, it is not necessary to remand for such a hearing under the facts of this case because the DNA evidence was merely corroborative of other evidence that, standing alone, was sufficient to support the conviction. A court will not reverse a conviction based on the erroneous admission of objected-to evidence so long as the admission was harmless beyond a reasonable doubt. *State v. Shannon*, 583 N.W.2d 579, 585 (Minn.1998). An error is harmless beyond a reasonable doubt "[i]f the verdict actually rendered was surely unattributable to the error." *State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996). To determine whether an erroneous admission of evidence was harmless, a court examines the record as a whole and considers the strength of the state's evidence and the weakness of any defense evidence. *State v. Van Wagner*, 504 N.W.2d 746, 749 (Minn.1993). As a general rule, an error is less likely to be prejudicial where the evi-

dence of guilt is strong. *State v. Dillon*, 532 N.W.2d 558, 558 (Minn.1995).

The state's purpose in using the DNA evidence was to prove that the victim's blood was on appellant's pants and shirt. Although the results of the PCR–STR test demonstrated that the victim's blood was on appellant's pants and shirt, there was other evidence establishing this fact. Specifically, appellant admitted to the police and in his testimony at trial that he was at the scene of the murder of Jolene Stuedemann, the victim, at or about the time that she was murdered. He also admitted to the police that the victim's blood was on his pants and shirt, that he had consensual sexual intercourse with the victim, and that he lied to the police investigators. In addition, the police found appellant's bloodstained clothing in the garage of the group home where the appellant resided. One of the other residents of the group home testified that he saw appellant discard the bloodied clothing in the garbage in the home's garage the morning after the murder. Moreover, the appellant's fingerprint was found on a newspaper stuffed in the mouth of the victim. Thus, the evidence derived from the PCR–STR test was merely corroborative of other evidence that, standing alone, was sufficient to support the conviction. Under these circumstances, any error in the admission of the DNA evidence is harmless. Accordingly, a remand to determine the reliability of the DNA evidence is unnecessary.

I would affirm the trial court on the denial of a *Frye–Mack* hearing on the first prong relating to general acceptability in the scientific community and decide the remaining issues in this case.