STATE of Minnesota, Respondent,

v.

Cletus Eugene SCHNEIDER, Appellant.

No. C0–98–1071.

Supreme Court of Minnesota.

July 15, 1999.

**890**

John M. Stuart, State Public Defender, Lyonel Norris, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., James Backstrom, Dakota County Atty., Nicole E. Nee, Asst. Dakota County Atty., Hastings, for respondent.

## OPINION

GILBERT, Justice.

Cletus Eugene Schneider appeals from his conviction for the first-degree premeditated murder of his estranged wife, Dorothy Sandburg, in violation of Minn.Stat. § 609.185(1) (1998). The sole issue on appeal is whether the evidence against Schneider was sufficient to support the jury verdict. We affirm.

On the morning of Thursday, June 12, 1997, Dorothy Sandburg went from her home on Judicial Road in Burnsville to work in St. Cloud. Sandburg left work shortly after 4:00 p.m. The next day, June 13, Sandburg's sister, Colette Johnson, became concerned when she was unable to contact Sandburg and was informed by Sandburg's employer that Sandburg had not been at work on June 13. At about 7:00 p.m., Johnson went to Sandburg's home along with her other sister and her brother-in-law. The group attempted to open the front door, but Sandburg's body was blocking it. They immediately telephoned the police.

When police arrived, Johnson told them that she believed Schneider killed Sandburg. Sandburg and Schneider, who had been married nearly 25 years, were separated and on the eve of a martial dissolution trial, scheduled to commence on June 19, 1997. The marriage was both Sandburg's and Schneider's second.

After confirming that Sandburg was dead, police searched the exterior of the house, but found no signs of forced entry. Police also noted no evidence of a burglary and that everything in the house appeared "very neat, very tidy." Near Sandburg's body, police found an ATM envelope, an advertisement, a lunch bag, a set of keys, and a purse, indicating that she had been attacked shortly after her entry into the home. Underneath Sandburg's wrist was a boat tiller. Schneider kept a sailboat in the yard and a boat tiller in the basement of the Judicial Road home. Police found a second boat tiller stored in the basement near other boating equipment.

Investigators from the Bureau of Criminal Apprehension (BCA) collected five drops of blood originating from the murder scene. One drop of blood was collected from Sandburg's abdomen and three drops were collected from the floor near her body. The fifth drop of blood was taken from Sandburg's left shoe after the autopsy. A BCA investigator identified the particular drops for examination be-

cause they were circular, indicating that they fell from a source directly above the location of the drop, possibly from the perpetrator.

Dr. Lindsey Thomas, assistant coroner for Dakota County, arrived at Sandburg's home at approximately 9:00 p.m. on Friday, June 13. After examining the body, she concluded that Sandburg had probably been dead for at least 24 hours. The following Monday, Thomas conducted an autopsy. The autopsy revealed that Sandburg's head injury was consistent with having been struck with the boat tiller found under her wrist. Sandburg also had injuries to her neck, and the cause of her death was manual strangulation.

Saturday morning, June 14, officers interviewed Schneider at the home of his son in law and daughter. Schneider had been residing with his daughter and son-in-law since a December 1996 court order excluded him from the Judicial Road home. The officers informed Schneider of Sandburg's death, and then interviewed him. Schneider appeared nervous during the interview, and did not inquire as to the cause of Sandburg's death until 49 minutes into the interview. Schneider told the officers about the impending marital dissolution proceeding and about financial stress between him and Sandburg. According to Schneider, he and Sandburg kept separate finances during their marriage, and Schneider saved his money while Sandburg spent her income. When the officers asked who might benefit from Sandburg's death, Schneider responded that Sandburg's sons from her previous marriage were the beneficiaries of her life insurance. Schneider failed to mention that he was the beneficiary of over $200,000 worth of life insurance policies, a fact of which he had been apprised during the marital dissolution proceedings.

Schneider was cooperative with the police. He allowed the officers to seize any items they requested, including the clothes he claimed to have been wearing on June 12, which had since been laundered. Schneider also consented to the seizure of his truck and several of his tools. Schneider told the police his whereabouts on June 12 and 13. This version of his whereabouts differed slightly from his testimony at trial. Some of the details, such as his going to the credit union to deposit an unemployment check, were confirmed by outside sources. Schneider claimed that he was at his daughter's home during the time frame when police believed Sandburg was murdered. However, this assertion could not be confirmed by Schneider's daughter and was contradicted by the testimony of his son-in-law and some neighbors.

Police found no blood on the shirt, pants, or shoes that Schneider claimed to have been wearing on June 12. However, police did find human blood on a pair of shorts, two pair of underwear, and three shirts taken from Schneider's home in a later search. There was an insufficient quantity of blood to perform deoxyribonucleic acid (DNA) testing on the shorts, one pair of underwear, and one shirt. The blood on the other pair of underwear and shirts was consistent with that of Schneider. Police found no blood on the interior of Schneider's truck, and only a small amount of blood underneath the driver's side door handle. The amount of blood was too minute to be identified as human blood.

Schneider voluntarily submitted to an additional interview at the police station on Wednesday, June 18. Police asked Schneider why someone might want to kill Sandburg, to which Schneider responded that it was her "unyielding nature." Schneider insisted that he did not kill Sandburg. After the interview, police took hair and blood samples and fingerprints from Schneider.

On August 11, 1997, two months after the murder, police received the results of the DNA testing on the five drops of blood that originated from the crime scene. That same day, police arrested Schneider at the Judicial Road home, which he had

been maintaining at the request of police. Schneider was indicted on charges of first-degree premeditated murder, Minn.Stat. § 609.185(1); first-degree murder while committing burglary, Minn.Stat. § 609.185(3); second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (1998); and second-degree murder in violation of an order for protection, Minn.Stat. § 609.19, subd. 2(2).

At trial, Sandburg's divorce attorney testified that Sandburg filed for marital dissolution on July 24, 1996, nearly 1 year before her murder. During the marital dissolution proceedings, the couple's primary assets were listed as follows: Judicial Road home, $176,700; industrial lot, $34,100; house in Mexico, $4,000; Schneider's IRA, $217,780; Schneider's cash account, $40,000; and Sandburg's life insurance, $268,000. The values of and claims to most of these assets were disputed in the marital dissolution proceedings.

Sandburg's divorce attorney testified that in December 1996, both Sandburg and Schneider moved for exclusive use and possession of the Judicial Road home. The court granted Sandburg temporary use and possession of the home. The order included a standard provision mutually restraining Schneider and Sandburg from "interfering with, harassing, maltreating, vilifying, or molesting the other party."

Sandburg's divorce attorney also testified that on May 9, Schneider informed her that he was depressed and wanted a continuance of trial, which had been scheduled for May 15. On May 15, Sandburg's attorney went to court anticipating Schneider would request a continuance, but Schneider did not appear. A new trial date was set for June 19, 1997, just one week after Sandburg's death. Schneider had terminated the services of his attorney over a fee dispute, and as of June 12, 1997, Schneider had not hired a new attorney to represent him at trial.

Sandburg's divorce attorney also read into evidence an affidavit filed by Schneider on November 21, 1996, which referred to Sandburg as "narcissistic" and "exploitative." She further testified regarding two incidences where, prior to being granted exclusive use and possession of the Judicial Road home, Sandburg locked Schneider out of the home. Both times, Schneider was able to gain entry into the home despite the locks.

One of Schneider's co-workers testified that, "on two occasions I remember specifically [Schneider] said * * * that the only way he would be able to keep his money is if Dorothy wasn't alive."

At trial, Schneider testified in his own defense. On cross-examination, he read into evidence part of a letter that he wrote in 1993 or 1994 regarding being locked out of the Judicial Road home. In that letter, Schneider wrote, "I got so mad. It's a good thing then that I'm not a violent person or I would have killed her right there." He also read part of a document dated February 6, 1997, in which he wrote, "I am a married male having just turned 59 years of age. I have greatly diminished self-esteem. I am extremely frustrated. I believe that I am on the verge of severe depression or rage."

Schneider also read into evidence a letter he had written to a friend in February 1997, in which he wrote:

> And to top everything off Dorothy is being one monster of a lying bitch. I don't know if I had mentioned anything about her neurotic condition. She has not been diagnosed professionally, but without doubt she has narcissistic mental disorder.

Additionally, Schneider responded in the affirmative when asked, in regard to the impending divorce, whether Sandburg had control and was prepared and whether "the next judge was going to do like the first and not listen to [him] and give the woman all the breaks."

The state introduced extensive testimony regarding DNA evidence. Schneider did not object to the introduction of the

DNA evidence. His attorney expressly waived a *Frye* hearing with respect to polymerase chain reaction (PCR), one of the two types of DNA testing performed in this case, conceding that "it's pretty well known that PCR * * * is pretty much acceptable in terms of scientific standards."

Delores Schoenbauer, a BCA analyst, testified she performed two types of tests on the five blood drops that originated from the crime scene. The first test, PCR, uses a kit from the Perkin–Elmer Company to "amplify" the amount of DNA present in a sample. Once the amount of DNA is amplified, the test results come back in the form of dots at varying locations on a strip, which represent alleles. The results can then be compared to other test results to eliminate possible contributors to the sample. Through the PCR test, Schoenbauer determined that each of the five drops of blood originating from the scene was a mixture of two or more persons' DNA. Schoenbauer testified that from each evidence sample, Sandburg, one of Sandburg's sons, and Schneider could not be eliminated as possible contributors. Schoenbauer further testified that Schneider's DNA was consistent with the "predominant DNA types" from each of the five samples. Schoenbauer also testified that the likelihood of a random person matching the evidence samples was 1 in 27,900 Caucasians, 1 in 120,000 African–Americans, and 1 in 18,400 Native Americans.

The second test Schoenbauer performed was restriction fragment length polymorphism (RFLP), which "fragments" the DNA. Results are obtained in the form of an autorad, a small strip that depicts bands present in the DNA. These autorads are then compared to other autorads to eliminate possible contributors to the sample. RFLP is more discriminating than PCR. Schoenbauer felt that there was not enough DNA present in the drops from Sandburg's abdomen and the entryway floor to perform RFLP, and therefore combined these four samples into one sample and performed RFLP on the combined sample. She also performed RFLP on the shoe sample. Schoenbauer determined that the DNA in the combined sample and the shoe sample matched Schneider's DNA, and that the probability of a random match was 1 in 16.5 million persons.

At trial, the defense called into question the procedures used by the BCA in both the collection and analysis of the blood samples. There was extensive cross-examination of the state's experts and the defense had two of its own expert witnesses. In preparation for trial the defense experts had access to all of the BCA's laboratory notes and results, as well as pictures of the crime scene. The defense alleged the following errors: (1) the absence of blind controls during certain parts of the analysis; (2) the lack of a control called substrate testing, which is testing of a sample taken from an unstained portion of the same item from which the blood sample was taken; (3) the BCA's policy of not always changing gloves between handling of every sample; (4) the BCA's policy of working on more than one case and more than one sample at a time; (5) the BCA's policy allowing an analyst to know which samples were from the victim, the suspect, and the evidence, as possibly contributing to biased results; (6) incorrect attribution of certain aspects of the PCR test results to one contributor and others to another contributor, which could have resulted in an improper match and inaccuracy regarding the probability of a random match; (7) an inaccurate date on a control; (8) an inaccurate case number written on a set of results when Schoenbauer had been working on two cases at the same time; (8) inaccurate results written for analysis on a sample that produced no results; (9) an admission by Schoenbauer that nothing in the BCA protocol would allow her to combine the four blood drops to perform one RFLP test, an action that prohibited discovery of which drop produced which results in the RFLP test;

and (10) a problem with the temperature at which the Perkin–Elmer PCR kit is run.

Based on the results and the multiple alleged errors in the collection and analysis of the samples, the defense's expert witness opined that both the PCR and RFLP test results were "unreliable" and "inconclusive." He further testified that the results of both the RFLP tests were "consistent with contamination." The defense offered no evidence of any specific violation of the BCA's written protocol or of the Technical Working Group on DNA Analysis Methods (TWGDAM). *See State v. Jobe*, 486 N.W.2d 407, 419–20 (Minn. 1992) (discussing need for compliance with appropriate written protocol and TWGDAM guidelines).

State witnesses testified that most of the alleged errors were not errors at all. Schoenbauer conceded making some errors, but testified that the errors were merely transcription errors that were promptly corrected and did not in any way affect the results of the tests. A state rebuttal witness testified that, given the quality and quantity of DNA the BCA had to work with, the results were "excellent," "valid," and reliable. He also testified that he would not consider the results consistent with contamination.

The jury found Schneider guilty of each charged offense, and the trial court sentenced him on the first-degree premeditated murder verdict. On appeal, Schneider asserts only that the evidence was insufficient to support the jury verdict, and concedes that the only element of first-degree murder at issue is identity.

Neither Schneider nor his attorney contested the admissibility of the DNA evidence, either at trial or in the briefs submitted to us. In fact, Schneider expressed no concerns whatsoever regarding the reliability of the DNA evidence until trial, and at oral argument Schneider's attorney specifically stated that he did not dispute the admissibility of the DNA evidence. The record reflects that Schneider was represented by three experienced and capable trial attorneys who engaged in substantial pre-trial preparation, including retaining two expert witnesses whose opinions differed from the state's experts. Defense counsel was fully prepared to, and did, extensively cross-examine the state's experts on the alleged deficiencies.

■ Defense counsel's tactical decisions as to whether to request a *Frye* hearing, object to the admission of DNA evidence, or otherwise attempt to cast a reasonable doubt on the reliability of the DNA evidence were matters of trial strategy. *Cf. King v. State*, 562 N.W.2d 791, 795–96 (Minn.1997). We have recognized that to fully represent a client, counsel must have discretion and flexibility regarding trial strategy. *See id.* at 795. We note that because Schneider's counsel did not object to the admissibility of the DNA evidence, any objection to its admission was knowingly waived. *See Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996); *State v. Beard*, 288 N.W.2d 717, 718 (Minn. 1980); *State v. Bauer*, 512 N.W.2d 112, 115 (Minn.App.), *aff'd*, 516 N.W.2d 174 (Minn. 1994).

■ When an appeal is based on insufficient evidence, this court painstakingly reviews the record "to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). This court conducts that review "assuming the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). Circumstantial evidence is entitled to as much weight as other kinds of evidence. *See State v. Spaeth*, 552 N.W.2d 187, 193 (Minn.1996). However, where the verdict is the result of circumstantial evidence, it "will [only] be upheld if the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of his guilt."

*Webb,* 440 N.W.2d at 430 (quotations omitted). "[C]ircumstantial evidence must 'form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.' " *Id.* (quotation omitted). On appeal, we do not retry the case, but merely determine whether there was sufficient evidence to support the jury's conclusion. *Spaeth,* 552 N.W.2d at 192.

█ The evidence showed that Schneider had both motive and opportunity to kill Sandburg. The state presented testimony that Schneider was angry with Sandburg regarding the marital dissolution and division of their assets. At the time of Sandburg's death, the marital dissolution trial was one week away. Schneider had told a co-worker that the only way he could keep his money was if Sandburg was dead. Schneider also was the beneficiary of Sandburg's life insurance policies worth over $200,000. Schneider was familiar with the Judicial Road home, and had broken into the home twice in the months preceding Sandburg's death.

Furthermore, Schneider's claimed whereabouts at the time of the killing could not be confirmed, and was in fact contradicted by the testimony of his son-in-law. When Schneider was informed of Sandburg's death, he did not inquire as to the cause for 49 minutes. When asked who might have motive to harm Sandburg, Schneider told police that her sons were the beneficiaries on her life insurance, although he stood to gain over $200,000 from various insurance policies on Sandburg's life. Schneider also testified and denied killing Sandburg. The jury had ample opportunity to assess Schneider's credibility.

We acknowledge the numerous concerns raised by the defense regarding the collection and DNA analysis of the five blood samples from the murder scene. However, the jury was fully apprised of these issues throughout trial. There was conflicting expert testimony. The defense extensively cross-examined the state's experts, retained their own experts to testify, and focused on alleged problems with the state's DNA testimony in final argument. Thus, the jury had the opportunity to evaluate Schneider's efforts to discredit both the credibility of the state's expert witnesses and the reliability of the DNA analysis and results. Although expert opinions regarding the alleged errors varied dramatically, the state's expert witnesses testified without objection that the test results were excellent and reliable, and that the probability of a random match was 1 in 16.5 million persons. The jury had ample opportunity to evaluate the conflicting expert testimony.

As the finder of fact, it is the jury's role to consider all evidence presented and afford it proper weight in arriving at the verdict. Viewed in the light most favorable to the verdict, and assuming that the jury believed the state's witnesses and disbelieved all contrary evidence, the evidence is consistent with the conclusion that Schneider killed Sandburg and is inconsistent with any other rational conclusion. Thus, we hold that the evidence was sufficient to permit the jury to have found Schneider guilty of first-degree murder.

Affirmed.

PAUL H. ANDERSON, J., and STRINGER, J., concurring specially.

PAGE, J., dissenting,

PAUL H. ANDERSON, Justice (concurring specially).

I concur in the result reached by the majority. The evidence in this case was sufficient to permit the jury to find appellant guilty of the murder of his wife. I write separately to address the numerous concerns raised regarding the DNA analysis of blood samples collected at the murder scene. I share Justice Sandra Gardebring's opinion that "DNA analysis

provides a strong tool for law enforcement in identifying alleged perpetrators of criminal activity" and "because it is such a strong tool, its use should be structured in such a way as to give criminal defendants a meaningful opportunity to respond." *State v. Bloom,* 516 N.W.2d 159, 169 (Minn.1994) (Gardebring, J., concurring specially).

Here the appellant had a meaningful opportunity to respond to the DNA evidence. He had early and proper notice of the potential use of DNA evidence, expert assistance in identifying and then conveying to the jury alleged problems with the state's DNA analysis, and the opportunity to keep the jury fully apprised of issues throughout the trial. Thus, appellant's claim that the DNA evidence offered at his trial was inherently unreliable lacks merit.

Nevertheless, I must express my concern about the procedures followed by the BCA when conducting the DNA analysis. The results of a DNA analysis can be a very strong and powerful evidentiary tool. Because it is such a strong and powerful tool, any entity performing a DNA analysis must do its utmost to ensure that established standards, procedures, and protocols are always followed. Further, any party wishing to use a DNA analysis as evidence must accept the fact that if established standards, procedures, and protocols are compromised, the courts are willing and able to act without hesitation to remedy any error when necessary to insure that the interests of justice are served.

STRINGER, Justice.

I join in the special concurrence of Justice Paul H. Anderson.

PAGE, Justice (dissenting).

I respectfully dissent. Although Schneider did not object to the admissibility of the DNA evidence at trial or in his pro se brief, I believe its admission was error because the evidence lacked proper foundation. While failure to object to the admission of evidence at trial generally constitutes waiver of the issue on appeal, we do consider plain errors affecting substantial rights if the error had the effect of denying the defendant a fair trial. *Compare State v. Beard,* 288 N.W.2d 717, 718 (Minn.1980), *with State v. Williams,* 525 N.W.2d 538, 544 (Minn.1994), *and* Minn. R. Evid. 103(d) ("Nothing in this rule precludes taking notice of errors in fundamental law or of plain errors affecting substantial rights although they were not brought to the attention of the court."). "The test for determining plain error is whether there was or was not a reasonable likelihood that any error substantially affected the verdict." *Van Buren v. State,* 556 N.W.2d 548, 551 (Minn.1996) (citation and internal quotation omitted).

To determine if plain error occurred in this case, we must review whether the Bureau of Criminal Apprehension (BCA) complied with appropriate standards and controls when it tested the DNA evidence. *See State v. Schwartz,* 447 N.W.2d 422, 428 (Minn.1989). Given the powerful nature of DNA evidence, at a minimum proper foundation was required to determine the reliability of the test results before the evidence was put in front of the jury. No such foundation was laid. The evidence in the record strongly suggests that the DNA tests performed by the BCA were not conducted in accordance with appropriate laboratory standards and controls. Not only did the BCA analyst who conducted the tests combine the samples from Sandburg's abdomen and the entryway floor to perform the RFLP test even though she acknowledged that nothing in the BCA protocol would allow her to do so, she also failed to collect a substrate sample, failed to test the reagent blank control from the shoe sample, and failed to use a blind control for each blood sample, among other possible testing errors. Thus, the DNA evidence should not have been admitted.[1]

1. While the record indicates that defense counsel waived a pretrial hearing on the ad-

Obviously, as a result of the erroneous admission of the DNA evidence, there is a reasonable likelihood that there was a substantial effect on the verdict because absent the DNA evidence, the evidence tying Schneider to Sandburg's murder was extremely weak. That evidence alone, viewed in a light most favorable to the verdict, is not sufficient to support Schneider's conviction. Therefore, I would reverse.

missibility of the DNA evidence, " '[t]he adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.' " *State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993) (quoting I ABA Standards for Criminal Justice, Special Functions of the Trial Judge 6–1.1 (2d ed.1979)).